# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>An Apple Iphone X, Model MQA62 bearing IMEI<br>356727086054812 and serial number G6TVQH06JCLG<br>In the possession of the Metropolitan Police Department | )<br>)<br>)<br>)<br>)<br>)    Case No.  20-sw-54 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A.

located in the _____ District of _____ Columbia _____ , there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 22 DC Code, Section 3002 | First Degree Sexual Abuse |
| 18 U.S.C. Section 1201 | Kidnapping |
| 22 DC Code, Section 3008 | First Degree Child Sexual Abuse |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Alix Skelton, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____ 02/21/2020 _____

_____
*Judge's signature*

City and state:  Washington, DC

G. Michael Harvey, Magistrate Judge
*Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| An Apple Iphone X, Model MQA62 bearing IMEI 356727086054812 and serial number G6TVQH06JCLG In the possession of the Metropolitan Police Department | ) ) ) ) |

Case No.    20-sw-54

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ District of _____ Columbia _____
*(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B.

**YOU ARE COMMANDED** to execute this warrant on or before _____ March 5, 2020 _____ *(not to exceed 14 days)*
❑ in the daytime 6:00 a.m. to 10:00 p.m.    ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ G. Michael Harvey _____ .
*(United States Magistrate Judge)*

❑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❑ for _____ days *(not to exceed 30)*   ❑ until, the facts justifying, the later specific date of _____ .

Date and time issued:    02/21/2020 3:00 pm _____   _____
                                                        *Judge's signature*

City and state:    Washington, DC _____   G. Michael Harvey, Magistrate Judge
                                              *Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>    20-sw-54 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____

*Executing officer's signature*

_____

*Printed name and title*

## ATTACHMENT A

### *Property to be searched*

An Apple iPhone X, model MQA62, bearing IMEI 356727086054812, and Serial Number G6TVQH06JCLG previously seized from the person of JEREMIAH MCCRIMMON pursuant to Rule 41 and currently in the possession of the Washington, DC Metropolitan Police Department.

## ATTACHMENT B

### *Property to be seized*

1.          The items, information, and data to be seized are fruits, evidence, information, contraband, or instrumentalities, in whatever form and however stored, relating to violations of (1) Title 18, United States Code, Section 1201, Kidnapping; (2) Title 18, United States Code, Section 2262, Interstate Violation of a Protection Order; (3) Title 22, DC Code, Section 2001, Kidnapping; (4) Title 22, DC Code, Section 3002 First Degree Sexual Abuse; (5) Title 22, DC Code, Section 3004, Third Degree Sexual Abuse; (6) Title 22, DC Code, Section 3008 First Degree Child Sexual Abuse; and (7) Title 22, DC Code, Section 3009 Second Degree Child Sexual Abuse, as described in the search warrant affidavit, including, but not limited to:

  a.  evidence of who used, owned, or controlled the Device(s) at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, text messages, chat, instant messaging logs, photographs, videos, and correspondence;

  b.  evidence regarding the location of the phone including geolocation information, and images and videos which would tend to identify the location of the phone at a particular time.

  c.  evidence of software, or the lack thereof, that would allow others to control the Device(s), such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

d.   evidence of the attachment to the Device(s) of other storage devices or similar containers for electronic evidence;

e.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device(s);

f.   evidence of the times the Device(s) was used;

g.   evidence of attempts to obfuscate the user's identity or to evade law enforcement;

h.   passwords, encryption keys, and other access devices that may be necessary to access the Device(s);

i.   documentation and manuals that may be necessary to access the Device(s) or to conduct a forensic examination of the Device(s);

j.   records of or information about Internet Protocol addresses used by the Device(s);

k.   records of or information about the Device(s)'s Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## SEARCH WARRANT

TO:            CHIEF OF POLICE OR ANY OTHER LAW ENFORCEMENT OFFICER
(Specific law Enforcement Officer or Classification of Officer of the Metropolitan Police Department or other Authorized Agency)

AFFIDAVIT, herewith attached, having been made before me by **Detective Sean McCloskey, of the Metropolitan Police Department, Youth and Family Services Division,** that he has probable cause to believe that on the person of **Jeremiah McCrimmon, a black male with date of birth September 11, 1997 and SSN # 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,** as more fully set forth in the affidavit in support of this search warrant, which affidavit is incorporated herein by reference in the District of Columbia, there is now being concealed evidence, namely Jeremiah McCrimmon's cheek cells/saliva (buccal swab), and digital device used during the commission of the offense

WHICH IS <u>evidence of a violation of First Degree Sexual Abuse in violation of 22 D.C. Code Section 3002 (2001 ed.)</u> and as I am satisfied that there is probable cause to believe that the evidence so described is being concealed in the above listed person at the above listed place and that the foregoing grounds for issuance of the warrant exist.

YOU, WITH THE ASSISTANCE OF THE UNITED STATES MARSHAL SERVICE (if needed), ARE HEREBY AUTHORIZED within 10 days of the date of issuance of this warrant to search the designated person for the property specified, and if the property be found there,

YOU ARE COMMANDED TO SEIZE IT, TO WRITE AND SUBSCRIBE in an inventory of the property seized, to leave a copy of this warrant and return, and to file a further copy of this warrant and return with the Court on the next Court day after its execution.

Issued this _11_ day of _January_, 2019      _____
Judge, Superior Court of the District of Columbia

## RETURN

I received the above warrant on _____, 2019 and have executed it as follows: On _____, 2019 at ___ M., I searched the (person)(premises)(vehicles)(object) described in the warrant and I left a copy of the warrant and return with _____ properly posted. (name of the person searched)
The following is an inventory of the property taken pursuant to this warrant:
_____
_____

This inventory was made in the presence of _____

I swear that this is a true and detailed account of all property taken by me under this warrant.

_____
Executing Officer
Subscribed and sworn to before me this _____ day of _____, 20____

_____
Judge, Superior Court of the District of Columbia

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF: THE PERSON OF JERMIAH MCCRIMMON** | **SW No.** _____ |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, **Detective Sean McCloskey**, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the D.C. Superior Court Rules of Criminal Procedure for a warrant to search the person of JEREMIAH MCCRIMMON, hereinafter "PREMISES," further described in Attachment A, for the things described in Attachment B.

2.      I am a sworn Detective of the Metropolitan Police Department of the District of Columbia.  During my fifteen years of service, I have worked in the capacity of patrol officer, vice investigator, and currently as a detective in the Metropolitan Police Department Youth Family Services Divison.  My duties and responsibilities are to investigate sexual abuse and physical abuse crimes against infants, children, and adolescents that occur within the confines of the District of Columbia.  I have gained experience in conducting such investigations through training in seminars, classes, and everyday work, related to these types of investigations.  I have ~~also participated in numerous arrests and interviewed numerous victims, witnesses, and suspects~~ in these types of investigations.

*2019CSN208*

3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

4.     Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 22 D.C. Code §3002 occurred.   There is also probable cause to search the PREMISES, further described in Attachment A, for the things described in Attachment B.

## PROBABLE CAUSE

5.     On December 18, 2018, Detectives from the Metropolitan Police Department Youth Family Services Division were notified of A.S., a 13-year-old female, herein referred to as the complainant, was at Children's National Medical Center and was the victim of a kidnapping and sexual assault.   I responded to Children's National Medical Center and interviewed the complainant's mother.   The complainant's mother reported on December 18, 2018, the complainant was supposed to walk home from school in Prince Georges County, Maryland, to her grandmother's residence located at 5100 Cranmer Way, Capitol Heights, Maryland.   The complainant's mother advised the complainant never arrived at her grandmother's house after school and she (complainant's mother) began attempting to locate the complainant.   The complainant's mother was contacted by the complainant's grandmother at 5:42 pm on December 18, 2018, and advised the complainant was now at her grandmother's residence and that the complainant was reporting that she had been kidnapped and sexually assaulted by Jeremiah McCrimmon, herein referred to as the defendant.

2

6.     The complainant's mother reported after being notified of the sexual assault that she took the complainant to Children's National Medical Center for a sexual assault examination. The complainant's mother learned the following information about the assault from the complainant: the complainant was walking by the Oakcrest Tower Apartment Complex located at 2021 Brooks Drive, Capitol Heights, Maryland, towards her grandmother's house when the defendant approached the complainant, grabbed the complainant, put the complainant in his vehicle, handcuffed the complainant, and drove the complainant around Washington D.C. before going to the defendant's mother's house. Once at the defendant's mother's house, the defendant took the handcuffs off of the complainant. The defendant informed the complainant that in order for him to let her go that the complainant would have to perform oral sex on the defendant. The defendant grabbed the complainant's hair, forced the complainant to perform oral sex on the defendant and had vaginal sexual intercourse with the complainant. The defendant then drove the complainant back to where he picked her up in Prince Georges County, Maryland and let the complainant out of his vehicle.

7.     The complainant's mother advised the defendant used to live with her family previously in Maryland. The complainant's mother stated there was a prior incident between the complainant and defendant in Maryland when the defendant was living with the family. The complainant's mother described the prior incident in Maryland as the defendant grabbing the complainant's breast. The complainant's mother reported she obtained a protection order against the defendant for touching the complainant's breast and that the protection order was still active.

8.     I was able to confirm that a protection order was issued on January 1, 2018, by Judge Robert Heffron of the District Court of Maryland for Price Georges County. The

3

protection order is valid until January 8, 2019, and states that the defendant shall not contact the complainant or her mother by any means and that the defendant shall not abuse, threaten to abuse, and/or harass the complainant and her mother.

9.      I interviewed the complainant's stepfather at Children's National Medical Center. The complainant's stepfather reported the defendant is the husband of his foster sister. The complainant's stepfather reported after learning of the sexual assault he assisted the complainant's mother taking the complainant to the hospital for a medical examination. The complainant's stepfather advised he learned the following information from the complainant about the sexual assault: The complainant was walking to her grandmother's house after school when she was approached by the defendant. The defendant forced the complainant into his car and handcuffed her. The defendant drove the complainant around Washington D.C. and the complainant began to ask the defendant if the defendant was going to hurt her. The defendant told the complainant that he wanted to talk to the complainant about the protection order and how it was messing up his life. The defendant drove the complainant to his mother's house. At the defendant's mother's house, the defendant removed the handcuffs from the complainant. The defendant told the complainant that he wanted the complainant to make him climax and that he wanted to see the complainant's body. The defendant advised the complainant that he would let the complainant go if the complainant would make him "cum." The defendant made the complainant get naked, grabbed her by the hair and forced his penis in the complainant's face. The defendant forced the complainant to perform oral sex on him and then had vaginal sexual intercourse with the complainant. The complainant told the defendant it hurt when he was having vaginal sexual intercourse with her so the defendant stopped and made the complainant

perform oral sex again on him.  The defendant began to masturbate and began digitally penetrating the complainant's vagina with his fingers.  The defendant ejaculated on the complainant's vagina.  The defendant got the complainant dressed and then took her back to the apartment complex where he grabbed her.  The defendant also spoke of the complainant taking a pill (Plan B) in the morning.

10.    The complainant's stepfather reported the defendant drives a Ford Crown Victoria that was painted red and gray like a taxi cab.  The complainant's stepfather also confirmed that there is a protection order barring the defendant from contacting the complainant and her mother.

11.    While in the emergency room of Children's National Medical Center, the complainant informed a medical staff member that she was walking by an apartment building near her grandmother's townhouse in Maryland when the defendant approached her.  The complainant stated the defendant grabbed her, took the complainant to his vehicle where he put handcuffs on the complainant and drove the complainant to his mother's house in Washington D.C.  The complainant advised the medical staff member that the defendant told the complainant if you do something for me I'll let you go.

12.    On December 19, 2018, the complainant was medically examined by a nurse that conducts sexual assault examinations at Children's National Medical Center.  The complainant reported to this nurse that she was walking near the Oakcrest Tower Apartments when the defendant grabbed her arm, dragged her to his car, and handcuffed her hands together.  The complainant stated the defendant drove her around Washington D.C., and then to his mother's house where the defendant took the complainant inside the residence and removed the handcuffs.  The complainant advised the defendant was frustrated /mad, told the complainant that she

5

messed up his life with the protection order and that he had temptations to do something to the complainant. The defendant told the complainant he would let her leave if the complainant made him climax and if she showed her butt to the defendant. The complainant reported the defendant began to touch and digitally penetrated her vagina with his fingers before forcing the complainant to perform oral sex on the defendant. The complainant informed the nurse that she did not know what to do anymore and that "pre-cum" came out of the defendant's penis. The complainant advised the defendant then put her on a bed and tried to put his penis inside of her vagina but that only the head of the penis would go in her vagina. The defendant again made the complainant perform oral sex on him again while he digitally penetrated the complainant's vagina with his fingers. The complainant reported to the nurse that the defendant started rubbing his penis and began to climax. The complainant informed the nurse that the defendant put the head of his penis back in the complainant's vagina and climaxed inside of her. The complainant stated the defendant took the complainant back to her grandmother's house where she ran inside.

13.     The nurse who conducted the sexual assault examination noted the complainant had no physical abnormalities appreciated but that she had scant white vaginal discharge. The nurse also took swabs from several areas of the complainant's body, including from her external genitalia, thighs, vagina, and perianal/buttocks area in an attempt to recover any DNA evidence.

14.     The intimate swabs collected from the complainant's body have been submitted for testing for potential DNA evidence.

15.     On December 19, 2018, the complainant was interviewed by Detectives from the Prince Georges County Police Department Sexual Assault Unit and reported the following information: After school, the complainant was walking to her grandmother's house when she

6

noticed the defendant's vehicle in the Oakcrest Tower Apartment complex. The complainant noticed the defendant squatting down beside his vehicle. The defendant approached the complainant, walked in front of her, grabbed her by her arm and took her to his vehicle. The defendant told the complainant to sit in the back of his vehicle and then handcuffed the complainant. The defendant then drove the complainant around Washington D.C. While in the vehicle, the complainant asked the defendant if he was going to hurt her. The defendant informed the complainant that the protection order had messed up his life.

16.    The defendant drove the complainant to his mother's house in Washington D.C., and took the complainant upstairs inside the house. The defendant began searching for the key to the handcuffs inside the residence. The defendant eventually pulled the handcuff key from his pocket and took the handcuffs off of the complainant. While in the residence, the defendant informed the complainant that he was a security guard and was trying to become a police officer. The defendant was holding the complainant by her backpack straps and that if the complainant showed her butt to him that he would let the complainant go. The defendant told the complainant that he wanted her and told the complainant to hug him. The defendant then again instructed the complainant to show her butt and that he would let the complainant go. At this time the complainant slowly pulled her school pants down and the defendant told the complainant to take her underwear off. Once the complainant removed her underwear, the defendant started touching and digitally penetrating the complainant's vagina with his fingers.

17.    The complainant told the defendant to stop but the defendant continued to place his fingers in the complainant's vagina. The defendant pulled his penis out of his pants and told the complainant if she made the defendant climax that he would let her go. The defendant forced

7

the complainant to perform oral sex on him by placing his penis in the complainant's mouth. The defendant informed the complainant he would climax faster if he put his penis in the complainant's vagina. The defendant had the complainant get on the bed, bent the complainant over and attempted to place his penis in the complainant's vagina. This hurt the complainant and caused her to push the defendant away. The defendant again made the complainant perform oral sex on him while he digitally penetrated the complainant's vagina with his fingers. The defendant began to touch himself and started to climax. The complainant reported when the defendant climaxed that he put his "cum" on her vagina and placed the head of his penis inside of the complainant's vagina while climaxing.

18.     The defendant had the complainant get dressed and they left the residence inside of his vehicle. The defendant drove the complainant back to the Oakcrest Tower Apartment Complex in Prince Georges County, Maryland, where he originally grabbed the complainant and let her go. While driving the complainant back, the defendant told the complainant he was going to get the complainant the "Plan B" pill and asked the complainant if he was going to get in more trouble. After being released from the defendant's vehicle the complainant ran to her grandmother's house and told her grandmother about what had happened with the defendant.

19.     On December 19, 2018, I met with the complainant. The complainant described the defendant's vehicle as looking like a cab that was painted red and gray. The complainant led me to the address of 2226 Hunter Place, Southeast, Washington D.C., and reported this was the defendant's mother's house where she was sexually assaulted by the defendant. The complainant additionally led me to the parking lot of the Oakcrest Tower Apartment Complex located at 2021 Brooks Drive, Capitol Heights, Maryland, and reported this was the address

8

where the defendant initially abducted her. I showed the complainant a single confirmation photograph of Jeremiah Trevell McCrimmon with a date of birth of September 1 1, 1997, obtained from a law enforcement database. The complainant identified the individual in the photograph as "Jeremiah" and as the individual that "abducted and raped" her.

20.     The complainant also stated that the defendant used his cellular phone while he had the complainant handcuffed in his vehicle and when the defendant was inside the residence of 2226 Hunter Place, Southeast, just prior to the sexual assault. From what the complainant could see it appeared that the defendant was sending text messages but she could not see the entire screen of the phone.

21.     I was able to learn from a law enforcement database that the defendant's mother, Crystal McCrimmon, lives at the address of 2226 Hunter Place, Southeast, Washington D.C, and that a police report from June 12, 2015, mentions the defendant being at this residence. I also noted there was a white Acura vehicle with DC tags FC5644 parked in the driveway of 2226 Hunter Place, Southeast, Washington D.C.   A WALES/NCIC check of the DC Tag 5644 revealed the vehicle is registered to the defendant's mother, Crystal McCrimmon, of 2226 Hunter Place, Southeast, Washington D.C.

22.     On December 19, 2018, I interviewed the complainant's grandmother.   The complainant's grandmother reported the complainant did not immediately come to her house after school on December 18, 2018.   The complainant's grandmother stated the complainant showed up at her reside at 5:42pm.   Upon her arrival to the home, the complainant reported to her grandmother that the defendant made her get in his vehicle and drove the complainant to his mother's house in Washington D.C., where the defendant forced the complainant to perform oral

sex on him. The complainant also informed her grandmother that she was handcuffed by the defendant, that the defendant had penetrated her vagina and that the defendant had "climaxed" inside of the complainant. The complainant's grandmother reported she contacted the defendant's wife by telephone and that the wife had stated the defendant was at work during the time of the sexual assault.

23.     I was able to retrieve security video footage from the Oakcrest Tower Apartment Complex located at 2021 Brooks Drive, Capitol Heights, Maryland. The following is a summary of that video footage reviewed:

24.     CAMERA 2031 EXT GUEST DRIVEWAY AND PARKING: On December 18, 2018, at 17:38:54 hours, the complainant is observed running on Ridley Street toward her Grandmother's residence.

25.     CAMERA 2021 EXT GUEST LOT TOWARDS BROOKS: On December 18, 2018, at 17:36:24 hours, the defendant's vehicle (red/gray Ford Crown Victoria) drives through the parking lot of 2021 Brooks Drive and stops. At 17:36:26 the complainant is observed exiting the passenger side rear door, walks around the back of the vehicle, and walks through the parking lot towards Ridley Street. The defendant's vehicle is observed driving in reverse through the parking lot and off camera.

26.     CAMERA 2021 EXT LOT TOWARD RIDLEY: On December 18, 2018, at 17:36:14 hours, the defendant's vehicle enters the parking lot of 2021 Brooks Drive, drives through the parking lot and off camera. At 17:37:52 hours, the defendant's vehicle reenters the camera frame driving in reverse through the parking lot towards the exit to Brooks Drive.

27.    CAMERA 2021 BOLLARD NULL:  This camera is affixed to the top of 2021 Brooks Drive.  On December 18, 2018, at14:46:23 hours, the defendant's vehicle is observed driving on Brooks Drive from the direction of Pennsylvania Avenue and pulls into the parking lot of 2021 Brooks Drive.  At 14:50:14 hours, it appears the complainant begins to walk through the parking lot, however, the camera is a distance away and it is hard to determine who the individual exactly is.  At 14:53:37 hours, the defendant's vehicle is observed exiting the parking lot and driving onto Brooks Drive towards Pennsylvania Avenue.

28.    CAMERA MAIN GATE ENTRY CAMERA 2: On December 18, 2018, at 14:46:11 hours, the defendant's vehicle is observed driving on Brooks Drive from the direction of Pennsylvania Avenue towards 2021 Brooks Drive.  At 14:53:37 hours, the defendant's vehicle is observed driving on Brooks Drive towards Pennsylvania Avenue.  At 17:36:28 hours, the defendant's vehicle drives through the parking lot of 2021 Brooks Drive and stops.  The complainant is observed exiting the passenger side rear door, walks around the back of the vehicle, appears to be looking at a cellphone and walking towards Ridley Street.  The defendant's vehicle is observed driving in reverse through the parking lot and off camera.

29.    CAMERA 2021 EXTERIOR GUEST ENTRANCE: On December 18, 2018, at 14:47:19 hours, the defendant's vehicle is observed attempting to back into a parking spot in the parking lot of 2021 Brooks Drive.  The vehicle then moves and backs into another parking spot. The defendant is observed to be crouching down on the passenger side of the vehicle while the complainant starts to walk through the parking lot.  As the complainant walks through the parking lot, the defendant stands up, walks around an Xfinity Van and approaches the complainant.  The defendant grabs the complainant by the arm and takes her to the passenger

11

side of his vehicle. On December 18, 2018, at 17:36:14 hours, the defendant's vehicle enters the parking lot of 2021 Brooks Drive, drives through the parking lot and off camera. At 17:37:52 hours, the defendant's vehicle reenters the camera frame driving in reverse through the parking lot towards the exit to Brooks Drive.

30.     CAMERA 2021 BOLLARD NULL: This camera is affixed to the top of 2021 Brooks Drive. On December 18, 2018, at14:46:23 hours, the defendant's vehicle is observed driving on Brooks Drive from the direction of Pennsylvania Avenue and pulls into the parking lot of 2021 Brooks Drive. At 14:50:14 hours, it appears the complainant begins to walk through the parking lot, however, the camera is a distance away and it is hard to determine who the individual exactly is. At 14:53:37 hours, the defendant's vehicle is observed exiting the parking lot and driving onto Brooks Drive towards Pennsylvania Avenue.

31.     CAMERA MAIN GATE ENTRY CAMERA 2: On December 18, 2018, at 14:46:11 hours, the defendant's vehicle is observed driving on Brooks Drive from the direction of Pennsylvania Avenue towards 2021 Brooks Drive. At 14:53:37 hours, the defendant's vehicle is observed driving on Brooks Drive towards Pennsylvania Avenue.

32.     On December 20, 2018, I met with the complainant and showed her a short video clip taken from Camera 2021 Exterior Guest Entrance. The complainant identified herself in the video clip and then identified the defendant as the individual grabbing her and putting her into his vehicle. The complainant was shown a second video clip taken from Camera 2031 Ext Guest Driveway and Parking. The complainant initially said she did not think she was in the video. The complainant asked to see the video again and then identified herself running in the video towards her grandmother's residence. The complainant reported she knew this was her because

12

she could see her backpack and her jacket. The complainant was also shown a still photograph of her exiting a red and gray Ford Crown Victoria at the Oakcrest Tower Apartment Complex. The complainant identified herself in the photograph and the car as belonging to the defendant.

33.     During this investigation, I learned the defendant is registered as an unarmed Special Police Officer with the Metropolitan Police Department Security Officers Management Branch and that his current home address was listed as 632 Audrey Lane, Apartment 103, Oxon Hill, Maryland. I know from his training and experience from working as a Detective with the Metropolitan Police Department that Special Police Officers routinely carry handcuffs during the course of their employment.

34.     On December 21, 2018, I responded to 632 Audrey Lane, Apartment 103, Oxon Hill, Maryland, and located a red and gray Ford Crown Victoria with Virginia tags UWZ7866 parked directly in front of the building. It should be noted this vehicle was similar to the defendant's vehicle observed on the security camera footage to include missing the driver's side rear hubcap. A WALES/NCIC check of the Virginia tag revealed the vehicle is registered to Makia Be Miller Gray McCrimmon. Through this investigation, I learned Makia Be Miller Gray McCrimmon is the wife of the defendant. On December 28, 2018, I once again responded to 632 Audrey Lane, Apartment 103, Oxon Hill, Maryland, and observed the Ford Crown Victoria with Virginia tags UWZ7866 parked in the parking lot, however, the vehicle's gray paint had been painted over with red paint.

35.     At the time of the sexual assault the complainant was 13-years-old and the defendant was approximately 21-years-old.

13

## TECHNICAL TERMS

Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.    "Digital device," as used herein, includes the following three terms and their respective definitions:

1)    A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.  Computers are physical units of equipment that perform information processing using a binary system to represent information.   Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2)    "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices.  Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3)    "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices

14

such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

b.     "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks. When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; utilizing global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

c.     A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen. Like wireless phones, tablets function as wireless communication devices and can be used to access the Internet or

15

other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise. Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

d.      A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations. Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.      "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data

security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

f.      "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

g.      The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

36.     As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found on the PREMISES, in whatever form they are found.  One form in which such items might be found is data stored on one or more digital devices.  Such devices are defined above and include any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections;

storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Thus, the warrant applied for would authorize the seizure of digital devices or, potentially, the copying of stored information, all under Rule 41. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that, if digital devices are found on the PREMISES, there is probable cause to believe that the items described in Attachment B will be stored in the Device(s) for at least the following reasons:

        a.      The defendant in this case had a digital device with him at the time he kidnapped the complainant and sexually abused her, and was actively using that device at various points throughout the offense. This use could have included internet activity, the use of applications, e-mail or other messaging programs, or even the taking of photographs.

        b.      Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

        c.      Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet. Electronic files downloaded to a digital device can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does

not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

37.    As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital device(s) were used, the purpose of their use, who used them (or did not), and when. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the Device(s) at issue here because:

a.      Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well.   In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant.   Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole.   Digital data stored in the Device(s), not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).   Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used.   Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords.   Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use.   Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created.   This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.   Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b.      Forensic evidence on a digital device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

c.      A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device. For example, the presence or absence of counter-forensic programs,

anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

38.     Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.      Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today. Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.      Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time. As a result, a

controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

        c.      Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

        d.      Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend

themselves to keyword searches. Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

    e.  Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software. The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device. Additionally, most smart phones and other mobile devices require passwords for access. For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode. Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering

most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer. Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many. For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

   f.  Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices. In light of these difficulties, I request permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

  39.  The volume of data stored on many digital devices will typically be so large that it will be extremely impractical to search for data during the physical search of the premises.

   a.  Therefore, in searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

1.     Upon securing the PREMISES, law enforcement personnel will, consistent with Rule 41 of the D.C. Superior Court Rules of Criminal Procedure, seize any digital devices (that is, the Device(s)), within the scope of this warrant as defined above, deemed capable of containing the information, records, or evidence described in Attachment B and transport these items to an appropriate law enforcement laboratory or similar facility for review. For all the reasons described above, it would not be feasible to conduct a complete, safe, and appropriate search of any such digital devices at the PREMISES. The digital devices, and/or any digital images thereof created by law enforcement sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

2.     The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

3.     In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a

determination as to whether the contents fall within the items to be seized as set forth in Attachment B. In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B. Any search techniques or protocols used in searching the contents of the seized digital devices will be specifically chosen to identify the specific items to be seized under this warrant.

## BIOMETRIC ACCESS TO DEVICE(S)

40.     This warrant permits law enforcement agents to obtain from the person of **JEREMIAH MCCRIMMON** the compelled display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any Device(s) requiring such biometric access subject to seizure pursuant to this warrant for which law enforcement has reasonable suspicion that the aforementioned person(s)' physical biometric characteristics will unlock the Device(s). The grounds for this request are as follows:

41.     I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features, and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

42.     If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called

"Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

43.     If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers (such as Apple's "Face ID") have different names but operate similarly to Trusted Face.

44.     If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

28

45.     In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password.  Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.  This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

46.     As discussed in this Affidavit, I have reason to believe that one or more digital devices, the Device(s), will be found during the search.  The passcode or password that would unlock the Device(s) subject to search under this warrant currently is not known to law enforcement.  Thus, law enforcement personnel may not otherwise be able to access the data contained within the Device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

47.     I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled.  This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time.  For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days.  Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device

equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

48.     Due to the foregoing, if law enforcement personnel encounter any Device(s) that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, this warrant permits law enforcement personnel to obtain from the aforementioned person(s) the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any Device(s), including to (1) press or swipe the fingers (including thumbs) of the aforementioned person(s) to the fingerprint scanner of the Device(s) found at the PREMISES; (2) hold the Device(s) found at the PREMISES in front of the face of the aforementioned person(s) to activate the facial recognition feature; and/or (3) hold the Device(s) found at the PREMISES in front of the face of the aforementioned person(s) to activate the iris recognition feature, for the purpose of attempting to unlock the Device(s) in order to search the contents as authorized by this warrant.

49.     The proposed warrant does not authorize law enforcement to require that the aforementioned person(s) state or otherwise provide the password, or identify specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the Device(s).  Nor does the proposed warrant authorize law enforcement to use the fact that the warrant allows law enforcement to obtain the display of any biometric characteristics to compel the aforementioned person(s) to state or otherwise provide that information.  However, the voluntary disclosure of such information by the aforementioned person(s) would be permitted under the proposed warrant.  To avoid confusion on that point, if agents in executing the warrant ask any of the aforementioned person(s) for the password to any

30

Device(s), or to identify which biometric characteristic (including the unique finger(s) or other physical features) unlocks any Device(s), the agents will not state or otherwise imply that the warrant requires the person to provide such information, and will make clear that providing any such information is voluntary and that the person is free to refuse the request.

## CONCLUSION

50.     I submit that this affidavit supports probable cause for a warrant to search the PREMISES described in Attachment A and to seize the items described in Attachment B.

**Affiant Detective Sean McCloskey**          **Assistant United States Attorney**

Subscribed and sworn before me this _11_ day of _January_, _2019_.

**Judge**
**Superior Court of the District of Columbia**

31

## ATTACHMENT A

*Property to be searched*

The property to be searched is **the person of JEREMIAH MCCRIMMON** (the "PREMISES"), further described as **a black male with a date of birth of September 11, 1997, and Social Security # 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.**

## ATTACHMENT B

*Property to be seized*

1.      The items to be seized are fruits, evidence, information, contraband, or instrumentalities, in whatever form and however stored, relating to violations of **22 D.C. Code § 3002**, as described in the search warrant affidavit, including, but not limited to:

**a. Buccal swab (cheek cells/saliva) of JEREMIAH MCCRIMMON;**

**b. Any digital device which is capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities as described in the search warrant affidavit and above, hereinafter the "Device(s)"**

2.      For any DEVICE seized:

a.   evidence of who used, owned, or controlled the Device(s) at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, text messages, chat, instant messaging logs, photographs, videos, and correspondence;

b.   evidence of software, or the lack thereof, that would allow others to control the Device(s), such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.   evidence of the attachment to the Device(s) of other storage devices or similar containers for electronic evidence;

    d.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device(s);

    e.   evidence of the times the Device(s) was used;

    f.   passwords, encryption keys, and other access devices that may be necessary to access the Device(s);

    g.   documentation and manuals that may be necessary to access the Device(s) or to conduct a forensic examination of the Device(s);

    h.   records of or information about Internet Protocol addresses used by the Device(s);

    i.   records of or information about the Device(s)'s Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

During the execution of the search of the PREMISES described in Attachment A, law enforcement personnel are also specifically authorized to obtain from **JEREMIAH MCCRIMMON** the compelled display of any physical biometric characteristics (such as fingerprint/thumbprint, facial characteristics, or iris display) necessary to unlock any Device(s) requiring such biometric access subject to seizure pursuant to this warrant for which law enforcement has reasonable suspicion that the aforementioned person(s)' physical biometric characteristics will unlock the Device(s), to include pressing fingers or thumbs against and/or putting a face before the sensor, or any other security feature requiring biometric recognition of:

    (a)    any of the Device(s) found at the PREMISES,

(b)     where the Device(s) are limited to those which are capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as described in the search warrant affidavit and warrant attachments,

for the purpose of attempting to unlock the Device(s)'s security features in order to search the contents as authorized by this warrant.

    While attempting to unlock the device by use of the compelled display of biometric characteristics pursuant to this warrant, law enforcement is not authorized to demand that the aforementioned person(s) state or otherwise provide the password or identify the specific biometric characteristics (including the unique finger(s) or other physical features), that may be used to unlock or access the Device(s).  Nor does the warrant authorize law enforcement to use the fact that the warrant allows law enforcement to obtain the display of any biometric characteristics to compel the aforementioned person(s) to state or otherwise provide that information.  However, the voluntary disclosure of such information by the aforementioned person(s) is permitted.  To avoid confusion on that point, if agents in executing the warrant ask any of the aforementioned person(s) for the password to any Device(s), or to identify which biometric characteristic (including the unique finger(s) or other physical features) unlocks any Device(s), the agents will not state or otherwise imply that the warrant requires the person to provide such information, and will make clear that providing any such information is voluntary and that the person is free to refuse the request.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "digital devices" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); security devices; and any other type of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

IN THE MATTER OF THE SEARCH OF:
APPLE iPHONE X, MODEL MQA62,
BEARING IMEI 356727086054812 and
SERIAL NUMBER G6TVQH06JCLG
PREVIOUSLY SEIZED FROM THE
PERSON OF JEREMIAH MCCRIMMON
PURSUANT TO RULE 41 AND IN THE
POSSESSION OF THE WASHINGTON,
DC METROPOLITAN POLICE
DEPARTMENT

Case No. 20-sw-54

**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41
FOR A WARRANT TO SEARCH AND SEIZE**

I, Special Agent Alix Skelton, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I, Alix Skelton, a Special Agent (SA) with the Federal Bureau of Investigation

(FBI), being duly sworn, depose and state as follows:

2.       I have been employed as a Special Agent of the FBI since December 2011 and

am currently assigned to the Washington Field Office, Child Exploitation and Human

Trafficking Task Force, at the Northern Virginia Resident Agency. While employed by the FBI,

I have investigated federal criminal violations related to cybercrime, child exploitation, and child

pornography.  I have gained experience through training by the FBI and everyday work relating

to conducting these types of investigations. I have also been the Affiant for and participated in

the execution of several federal search warrants in child sexual exploitation investigations.

3.      As a federal agent, I am authorized to investigate violations of United States laws

and to execute warrants issued under the authority of the United States.

4.      This affidavit is made in support of a search warrant, pursuant to Rule 41 of the

Federal  Rules  of  Criminal  Procedure,  and  18  U.S.C.  §§  2703(a),  2703(b)(1)(A)  and

2703(c)(1)(A), to search the Apple iPhone X (hereinafter referred to as the "DEVICE") belonging to JEREMIAH MCCRIMMON (hereinafter "MCCRIMMON") recovered from the person of MCCRIMMON upon his arrest and pursuant to a search warrant authorized by the Superior Court for the District of Columbia, on January 11, 2019. The DEVICE is further described in Attachment A, and is currently in the custody of the Washington, DC Metropolitan Police Department, in Washington, DC. Located within the DEVICE, I seek to seize via a forensic examination evidence, fruits, and instrumentalities relating to violations of (1) Title 18, United States Code, Section 1201, Kidnapping; (2) Title 18, United States Code, Section 2262, Interstate Violation of a Protection Order; (3) Title 22, DC Code, Section 2001, Kidnapping; (4) Title 22, DC Code, Section 3002 First Degree Sexual Abuse; (5) Title 22, DC Code, Section 3004, Third Degree Sexual Abuse; (6) Title 22, DC Code, Section 3008 First Degree Child Sexual Abuse; and (7) Title 22, DC Code, Section 3009 Second Degree Child Sexual Abuse, as more fully described in Attachment B.

5.     The statements contained in this affidavit are based upon my investigation, information provided by other law enforcement officers, other personnel specially trained in the seizure and analysis of computers and electronic media, and on my experience and training. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence of violations of (1) Title 18, United States Code, Section 1201, Kidnapping; (2) Title 18, United States Code, Section 2262, Interstate Violation of a Protection Order; (3) Title 22, DC Code, Section 2001, Kidnapping; (4) Title 22, DC Code, Section 3002, First Degree Sexual Abuse; (5) Title 22, DC Code, Section 3004, Third Degree Sexual Abuse; (6) Title 22, DC Code,

Section 3008, First Degree Child Sexual Abuse; and (7) Title 22, DC Code, Section 3009, Second Degree Child Sexual Abuse, exists in the device to be searched.

## **PROBABLE CAUSE**

6.      On January 11, 2019, Detective Sean McCloskey of the Washington, DC Metropolitan Police Department, made application to the Superior Court for the District of Columbia for a warrant to search the person of JEREMIAH MCCRIMMON and to conduct a forensic examination of any electronic device found on his person, for evidence, fruits, and instrumentalities of a violation of Title 22, DC Code, Section 3002, First Degree Sexual Abuse. That Court authorized that search, and issued a warrant on the same day.  A copy of that warrant, and Detective McCloskey's application and affidavit, laying out the probable cause to believe that on December 18, 2018, MCCRIMMON had sexually assaulted a 13 year-old female child, whose identity is known to your affiant and whose initials are A.S.A., is attached hereto as Exhibit 1, and is incorporated by reference as if fully set forth herein.

7.      Also on January 11, 2019, Detective McCloskey made application to the Superior Court for the District of Columbia for an arrest warrant based on a criminal complaint charging JEREMIAH MCCRIMMON with a violation of Title 22, DC Code, Section 3002, First Degree Sexual Abuse, which occurred on December 18, 2018. That Court also authorized the requested warrant on that date.

8.      Also, on January 11, 2019, law enforcement arrested MCCRIMMON and searched his person pursuant to the warrants issued by the Superior Court for the District of Columbia and referenced above in paragraphs Six and Seven, above.  Your affiant has spoken with members of law enforcement who executed the arrest and search of MCCRIMMON's person.

9.      Subsequent to his arrest and while at the Washington, DC Metropolitan Police Department, Youth and Family Services Division, MCCRIMMON was advised of his rights pursuant to *Miranda*, waived those rights, and voluntarily agreed to speak with law enforcement. Your affiant observed this video-recorded interview via closed circuit television from another room in the Police Department.

10.      During his interview with law enforcement, MCCRIMMON admitted to making contact with A.S.A. in the vicinity of Capitol Heights, Maryland, and putting her into his vehicle. He further admitted to removing the battery from her cell phone and putting handcuffs on her wrists at that time.

11.      MCCRIMMON advised law enforcement that he drove from the location in Capitol Heights, Maryland to a residence known to him at 2226 Hunter Place SE, Washington, DC. Upon arrival at that location, MCCRIMMON took A.S.A. inside the residence which he knew to be vacant. While inside the residence, MCCRIMMON admitted to sexually assaulting A.S.A., specifically by putting his penis inside her mouth. MCCRIMMON further advised that after the sexual assault, he drove A.S.A. back to Capitol Heights, Maryland, and released her from the vehicle.

12.      Your affiant is aware that the DEVICE was located by law enforcement during the search of MCCRIMMON's person on January 11, 2019 as authorized by the search warrant referenced in paragraph six, above. During the video-recorded interview, your affiant personally requested the six digit passcode to the device from MCCRIMMON at the conclusion of his interview. MCCRIMMON voluntarily provided your affiant with the passcode which was successfully used to access the device.

13.     On the same date, your affiant conducted the forensic examination of the DEVICE which was also authorized by the search warrant referenced in paragraph six, above. Specifically an advanced logical extraction was completed using the forensic software program Physical Analyzer, version 7.11.0.87. At the time of the extraction, this was the only extraction possible using the software available to your affiant.

14.     Your affiant has conducted an examination of the data retrieved by the referenced advanced logical extraction. Specifically, location information was recovered for the period during which the DEVICE was utilized by MCCRIMMON. This location information is based on GPS points automatically captured by the DEVICE when MCCRIMMON used mobile application such as Apple Maps, Waze and Uber, when he provided his exact GPS location to others via a "pin drop,[1]" his connection to various identified wifi networks, and from exif[2] data on image or videos files captured using the DEVICE.

15.     Although there was significant location data successfully extracted during the referenced advanced logical extraction, no location information was located for the period of time on December 18, 2018, during which your affiant believes MCRIMMON committed the referenced offenses.

16.     In her training and experience, you affiant believes there may be additional location information contained within the DEVICE which is relevant to the offenses.

---

[1] Based on her training and experience, your affiant is aware that users of cellular devices such as iPhone's can send a "pin drop" to another individual via SMS text or other means of communication. These "pin drops" include specific geolocation information identifying the exact location of the phone at the time the "pin drop" is sent.

[2] Based on her training and experience, your affiant is aware that exif data is data about the piece of data to which it is attached, i.e., a photo or video file. For example, exif data may include geolocation information, creation date and time stamps, make, model, and serial number of the device which created the file.

Specifically, data stored as "significant locations[3]" was not extracted as part of the advanced logical extraction completed on January 11, 2019 and referenced in paragraph 13, above. Your affiant is aware that this "significant locations" data is collected and maintained by cell phones such as the DEVICE as a default, unless the user actively turns this service off.

17.    Based on statements by A.S.A. and MCCRIMMON, and video surveillance footage depicting MCCRIMMON putting A.S.A. into and then taking her out of his vehicle, your affiant believes MCCRIMMON and A.S.A. were at 2226 Hunter Place SE, Washington, DC for approximately two hours. In your affiant's training and experience, she believes this length of time is sufficient to trigger collection and storage of location information as a "significant location."

18.    At this time, your affiant has additional software that is capable of conducting additional extractions on the DEVICE which may be capable of extracting additional information stored by the device, including, but not limited to, the "significant locations." Additionally, your affiant can manually navigate to a screen on the DEVICE which shows the user the "significant locations" data.

19.    Since the time the DEVICE was seized by law enforcement it has been maintained by the Washington, DC Metropolitan Police Department within the District of Columbia and in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the DEVICE first came into the possession of law enforcement.  Because this is a joint investigation between the FBI and the Washington, DC Metropolitan Police Department and the FBI, the FBI has full access to DEVICE and the DEVICE is, for all intents and purposes, in FBI custody.

---

[3] Based on her training and experience, your affiant is aware that the "significant locations" section contains data about locations which the particular device was present for any period of time.

20.     On January 23, 2020, a federal Grand Jury sitting in the District of Columbia returned an eleven count superseding indictment charging MCCRIMMON with one count each of: Title 18, United States Code, Section 1201, Kidnapping; Title 18, United States Code, Section 2262, Interstate Violation of a Protection Order; and Title 22, DC Code, Section 2001, Kidnapping; two counts each of Title 22, DC Code, Section 3002, First Degree Sexual Abuse; Title 22, DC Code, Section 3004, Third Degree Sexual Abuse; Title 22, DC Code, Section 3008, First Degree Child Sexual Abuse; and Title 22, DC Code, Section 3009, Second Degree Child Sexual Abuse

21.     For the reasons set forth above, I respectfully submit there is probable cause to believe that the device contains, among other things, evidence of MCCRIMMON's violations of law, specifically (1) Title 18, United States Code, Section 1201, Kidnapping; (2) Title 18, United States Code, Section 2262, Interstate Violation of a Protection Order; (3) Title 22, DC Code, Section 2001, Kidnapping; (4) Title 22, DC Code, Section 3002 First Degree Sexual Abuse; (5) Title 22, DC Code, Section 3004, Third Degree Sexual Abuse; (6) Title 22, DC Code, Section 3008 First Degree Child Sexual Abuse; and (7) Title 22, DC Code, Section 3009 Second Degree Child Sexual Abuse.

## **TECHNICAL TERMS**

22.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.      "Digital device," as used herein, includes the following three terms and their respective definitions:

1)      A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.  *See* 18 U.S.C. § 1030(e)(1). Computers are physical units of equipment that perform information processing using a binary system to represent information.  Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2)      "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices.  Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3)      "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

b.      "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks.  When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities.  These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

c.      A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations.  Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation.  The GPS consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives

signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

d.     "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

e.     "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

f.     Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet.  An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g.     The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

h.     "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.  ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite.  ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports.  Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber.  By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

i.     A "modem" translates signals for physical transmission to and from the ISP, which then sends and receives the information to and from other computers connected to the Internet.

j.     A "router" often serves as a wireless Internet access point for a single or multiple devices, and directs traffic between computers connected to a network (whether by wire or wirelessly).  A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf.  The router also distributes to the relevant

client inbound traffic arriving from the Internet.  A router usually retains logs for any devices using that router for Internet connectivity.  Routers, in turn, are typically connected to a modem.

k.      "Domain Name" means the common, easy-to-remember names associated with an IP address.  For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32.  Domain names are typically strings of alphanumeric characters, with each level delimited by a period.  Each level, read backwards – from right to left – further identifies parts of an organization.  Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and .edu for educational organizations.   Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice.  Additional levels may exist as needed until each machine is uniquely identifiable.  For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

l.      "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

m.      "VPN" means a virtual private network.  A VPN extends a private network across public networks like the Internet.  It enables a host computer to send and receive data across shared or public networks as if they were an integral part of a private network with all the functionality, security, and management policies of the private network.  This is done by establishing a virtual point-to-point connection through the use of dedicated connections, encryption, or a combination of the two.  The VPN connection across the Internet is technically a wide area network (WAN) link between the sites.  From a user perspective, the extended

network resources are accessed in the same way as resources available from a private network-hence the name "virtual private network."  The communication between two VPN endpoints is encrypted and usually cannot be intercepted by law enforcement.

n.      "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can.  In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext.  This is usually done with the use of an encryption key, which specifies how the message is to be encoded.  Any unintended party that can see the ciphertext should not be able to determine anything about the original message.  An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

o.      Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, and sometimes by implication who did not, as well as evidence relating to the commission of the offense(s) under investigation.

**COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS**

23.     As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found within the Device, in whatever form they are found.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is

probable cause to believe that the records and information described in Attachment B will be stored in the Device for at least the following reasons:

a.      Individuals who engage in criminal activity, including violations of 18 United States Code, Sections 2422(b) and 2251(a), as well as 22 D.C. Code Section 3008 use digital devices, like the Device, to access websites to facilitate illegal activity and to communicate with victims, witnesses, and co-conspirators online; to store on digital devices, like the Device, documents, photographs, recordings, messages, and other records relating to their illegal activity, which can include logs of online chats; email correspondence and correspondence through other applications; text or other "Short Message Service" ("SMS") messages; contact information of victims, witnesses, and other co-conspirators, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts; names, addresses, telephone numbers, and social security numbers of other individuals; records of internet searches and Web History browsers; I.P.addresses; and other means used in furtherance of these crimes as stated above, incorporated by reference here.

b.      Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

c.      Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet.  Electronic files downloaded to a digital device can be stored for years at little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  When a person "deletes" a file on a digital device

such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten.  In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

24.    As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital device(s) were used, the purpose of their use, who used them (or did not), and when.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the Device(s) at issue here because:

a.      Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well.   In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant.   Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole.   Digital data stored in the Device(s), not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).   Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used.   Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords.   Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use.   Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created.   This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.   Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b.      Forensic evidence on a digital device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

c.      A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device.  For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

f.      I know that when an individual uses a digital device to coerce another individual into engaging in sexual activity, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The digital device is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

## **METHODS TO BE USED TO SEARCH DIGITAL DEVICES**

25.      Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.      Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today.  Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise.  As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that

are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.      Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.      Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself.  Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

d.      Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file

contains text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms.  Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches.  Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format.  Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

e.     Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software.  The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before

examination of the device.  Additionally, most smart phones and other mobile devices require passwords for access.  For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode.  Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer.  Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many.  For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

f.      Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices.  In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

26.     In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

a.     The digital devices, and/or any digital images thereof created by law enforcement, sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

b.     The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

c.     In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B. In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B. Any search techniques or protocols used in searching the contents of the

Device(s) will be specifically chosen to identify the specific items to be seized under this warrant.

### **AUTHORIZATION TO SEARCH AT ANY TIME OF THE DAY OR NIGHT**

27.     Because forensic examiners will be conducting their search of the digital devices in a law enforcement setting over a potentially prolonged period of time, I respectfully submit that good cause has been shown, and therefore request authority, to conduct the search at any time of the day or night.

### **CONCLUSION**

28.     I submit that this affidavit supports probable cause for a warrant to search the DEVICE described in Attachment A and to seize the items described in Attachment B.

Respectfully submitted,

_____

Special Agent Alix Skelton
Federal Bureau of Investigation

Subscribed and sworn to before me on this _21st__day of February, 2020.